## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| CHRISTOPHER RENTOLA and SHERREE RENTOLA, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>DOW JONES & COMPANY, INC., a Delaware corporation,<br><br>Defendant. | Case No. 20-cv-11589<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Christopher Rentola and Sherree Rentola ("Plaintiffs"), individually and on behalf of themselves and all others similarly situated, by and through their attorneys, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge.

## <u>INTRODUCTION</u>

1.      Between May 4, 2015 and July 30, 2016, Defendant Dow Jones & Company, Inc. ("Defendant") rented, exchanged, and/or otherwise disclosed personal information about Plaintiffs' *The Wall Street Journal* print newspaper subscriptions to data aggregators, data appenders, data cooperatives, and list

brokers, among others, which in turn disclosed their information to aggressive advertisers, political organizations, and non-profit companies.  As a result, Plaintiffs have received a barrage of unwanted junk mail.  By renting, exchanging, and/or otherwise disclosing Plaintiffs' Personal Reading Information (defined below) between May 4, 2015 and July 30, 2016, Defendant violated Michigan's Preservation of Personal Privacy Act, H.B. 5331, 84th Leg. Reg. Sess., P.A. No. 378, §§ 1-4 (Mich. 1988), *id.* § 5, added by H.B. 4694, 85th Leg. Reg. Sess., P.A. No. 206, § 1 (Mich. 1989) (the "PPPA").[1]

2.     Documented evidence confirms these facts.  For example, a list broker, NextMark, offers to provide renters access to the Personal Reading Information of 1,182,239 active U.S. subscribers to *The Wall Street Journal* from the "News and Business Magazine Subscribers" mailing list at a base price of "$170/M [per thousand]," (i.e., 17 cents apiece).

---

[1] In May 2016, the Michigan legislature amended the PPPA. *See* S.B. 490, 98th Leg., Reg. Sess., P.A. No. 92 (Mich. 2016) (codified at M.C.L. § 445.1711, *et seq.*).  The May 2016 amendment to the PPPA, which became effective on July 31, 2016, does not apply retroactively to claims that accrued prior to its July 31, 2016 effective date.  *See Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 439-41 (S.D.N.Y. 2016) (holding that "the amendment to the [PP]PA does not apply to Plaintiffs' claims, and the Court will assess the sufficiency of those claims under the law as it was when Plaintiffs' claims accrued.") (citing *Landgraf v. USI Film Prods.*, 511 U.S. 224, 286 (1994)).  Because the claims alleged herein accrued, and thus vested, prior to the July 31, 2016 effective date of the amended version of the PPPA, the pre-amendment version of the PPPA applies in this case.  *See Horton v. GameStop, Corp.*, 380 F. Supp. 3d 679 (W.D. Mich. 2018).



# News and Business Magazine Subscribers Email/Postal/Phone Mailing List

The Wall Street Journal Subscribers mailing list features individuals that use this source of news for their business and industry needs. These influential individuals yield proven results for a wide variety of direct marketing campaigns. This list is the ideal tool to effectively build relationships with your unique audience.

*See* Complaint Ex. B.

  3.  Indeed, on April 13, 2011 Defendant published an article in *The Wall Street Journal* entitled *With Catalogs, Opt-Out Policies Vary.  See* Complaint Ex. C.  According to that article, "*The Wall Street Journal* sells its print-subscriber list

to marketers for $170 per 1,000 subscribers for each mailing, according to

NextMark Inc., which tracks such lists."  *Id.*

4.      By renting, exchanging, or otherwise disclosing the Personal

Reading Information of its Michigan-based subscribers between May 4, 2015 and

July 30, 2016, Defendant violated the PPPA.  Subsection 2 of the PPPA provides:

> [A] person, or an employee or agent of the person,
> engaged in the business of selling at retail, renting, or
> lending books or other written materials ... shall not
> disclose to any person, other than the customer, a record
> or information concerning the purchase ... of those
> materials by a customer that indicates the identity of the
> customer.

PPPA § 2.

5.      Accordingly, Plaintiffs bring this Class Action Complaint against

Defendant for its intentional and unlawful disclosure of its customers' Personal

Reading Information in violation of the PPPA, and for unjust enrichment.

## NATURE OF THE CASE

6.      To supplement its revenues, Defendant rents, exchanges, or

otherwise discloses its customers' personal information—including their full

names, titles of publications subscribed to, and home addresses (collectively

"Personal Reading Information"), as well as myriad other personal, lifestyle, and

demographic information such as gender, age, ethnicity, income, religion, parental

status, and political affiliation—to data aggregators, data appenders, data

4

cooperatives, and other third parties without the written consent of its customers.

7.     By renting, exchanging, or otherwise disclosing – rather than selling – its customers' Personal Reading Information, Defendant is able to disclose the information time and time again to countless third parties.

8.     Defendant's disclosure of Personal Reading Information, and other personal, demographic, and lifestyle information is not only unlawful, but also dangerous because it allows for the targeting of particularly vulnerable members of society.

9.     While Defendant profits handsomely from the unauthorized rental, exchange, and/or disclosure of its customers' Personal Reading Information and other personal information, it does so at the expense of its customers' privacy and statutory rights because Defendant does not obtain its customers' written consent prior to disclosing their Personal Reading Information.

## **PARTIES**

10.     Plaintiff Christopher Rentola is a natural person and citizen of the State of Michigan.  Mr. Rentola was a subscriber to the print edition of *The Wall Street Journal*.  *The Wall Street Journal* is published by Defendant.  While residing in, a citizen of, and present in Michigan, Mr. Rentola purchased his subscription to *The Wall Street Journal* directly from Defendant via postcard.  At no time did Mr. Rentola subscribe to online edition of *The Wall Street Journal*, nor did he ever

subscribe to the print edition of *The Wall Street Journal* via online means.  Prior to and at the time he subscribed to *The Wall Street Journal*, Defendant did not notify Mr. Rentola that it discloses the Personal Reading Information of its customers, and Mr. Rentola has never authorized Defendant to do so.  Furthermore, Mr. Rentola was never provided any written notice that Defendant rents, exchanges, or otherwise discloses its customers' Personal Reading Information, or any means of opting out.  Since subscribing to *The Wall Street Journal*, and between May 4, 2015 and July 30, 2016, Defendant disclosed, without consent or prior notice, Mr. Rentola's Personal Reading Information to data aggregators, data appenders, and/or data cooperatives, who then supplement that information with data from their own files.  Moreover, during that same period, Defendant rented or exchanged mailing lists containing Mr. Rentola's Personal Reading Information to third parties seeking to contact Defendant subscribers, without first obtaining Mr. Rentola's written consent or even giving him prior notice of the rentals, exchanges, and/or other disclosures.  Because Defendant rented, exchanged, and/or otherwise disclosed his Personal Reading Information, Mr. Rentola now receives junk mail from charities and other organizations that do not offer products or services to consumers.  These unwarranted mailings waste Mr. Rentola's time, money, and resources.  These harassing junk mailings received by Mr. Rentola are attributable to Defendant's unauthorized rental, exchange, and/or disclosure of his Personal

Reading Information.  Because Mr. Rentola is entitled by law to privacy in his Personal Reading Information, and because he paid money for his subscription, Defendant's disclosure of his Personal Reading Information deprived Mr. Rentola of the full set of benefits to which he was entitled as a part of his *The Wall Street Journal* subscription, thereby causing economic harm.  Accordingly, what Mr. Rentola received (a subscription without statutory privacy protections) was less valuable than what he paid for (a subscription with accompanying statutory privacy protections), and he would not have been willing to pay as much, if at all, for his *The Wall Street Journal* subscription had he known that Defendant would disclose his Personal Reading Information.

11.     Plaintiff Sherree Rentola is a natural person and citizen of the State of Michigan.  Ms. Rentola was a subscriber to the print edition of *The Wall Street Journal*.  *The Wall Street Journal* is published by Defendant.  While residing in, a citizen of, and present in Michigan, Ms. Rentola purchased her subscription to *The Wall Street Journal* directly from Defendant via postcard.  At no time did Ms. Rentola subscribe to online edition of *The Wall Street Journal*, nor did she ever subscribe to the print edition of *The Wall Street Journal* via online means.  Prior to and at the time she subscribed to *The Wall Street Journal*, Defendant did not notify Ms. Rentola that it discloses the Personal Reading Information of its customers, and Ms. Rentola has never authorized Defendant to do so.  Furthermore, Ms.

7

Rentola was never provided any written notice that Defendant rents, exchanges, or otherwise discloses its customers' Personal Reading Information, or any means of opting out.  Since subscribing to *The Wall Street Journal*, and between May 4, 2015 and July 30, 2016, Defendant disclosed, without consent or prior notice, Ms. Rentola's Personal Reading Information to data aggregators, data appenders, and/or data cooperatives, who then supplement that information with data from their own files.  Moreover, during that same period, Defendant rented or exchanged mailing lists containing Ms. Rentola's Personal Reading Information to third parties seeking to contact Defendant subscribers, without first obtaining Ms. Rentola's written consent or even giving her prior notice of the rentals, exchanges, and/or other disclosures.  Because Defendant rented, exchanged, and/or otherwise disclosed her Personal Reading Information, Ms. Rentola now receives junk mail from charities and other organizations that do not offer products or services to consumers.  These unwarranted mailings waste Ms. Rentola's time, money, and resources.  These harassing junk mailings received by Ms. Rentola are attributable to Defendant's unauthorized rental, exchange, and/or disclosure of her Personal Reading Information.  Because Ms. Rentola is entitled by law to privacy in her Personal Reading Information, and because she paid money for her subscription, Defendant's disclosure of her Personal Reading Information deprived Ms. Rentola of the full set of benefits to which she was entitled as a part of his *The Wall Street*

*Journal* subscription, thereby causing economic harm.  Accordingly, what Ms. Rentola received (a subscription without statutory privacy protections) was less valuable than what she paid for (a subscription with accompanying statutory privacy protections), and she would not have been willing to pay as much, if at all, for her *The Wall Street Journal* subscription had she known that Defendant would disclose her Personal Reading Information.

12.    Defendant Dow Jones & Company, Inc. is a Delaware corporation with its principal place of business at 1221 Avenue of the Americas, New York, NY 10036.  Defendant is a subsidiary of News Corp. and is a publishing and financial information firm that focuses on financial news publications, including its flagship publication *The Wall Street Journal*.  Other consumer-oriented publications of Defendant include *Barron's Magazine* and *Financial News*. Defendant does business throughout Michigan and the entire United States.

### JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.  This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

14.     The Court has personal jurisdiction over Defendant because Plaintiffs' claims arose in substantial part from actions and omissions in Michigan, including from Plaintiffs' purchases of *The Wall Street Journal* subscriptions in Michigan, Defendant's direction of such *The Wall Street Journal* subscriptions into Michigan, and Defendant's failure to obtain Plaintiffs' written consent in Michigan prior to disclosing their Personal Reading Information, including their residential addresses in Michigan, to another person, the effects of which were felt from within Michigan by citizens and residents of Michigan.  Personal jurisdiction also exists over Defendant in Michigan because Defendant conducts substantial business within Michigan, such that Defendant has significant, continuous, and pervasive contacts with the State of Michigan.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant does substantial business in this District and a substantial part of the events giving rise to Plaintiffs' claims took place within this judicial District.

## FACTUAL BACKGROUND

### *Michigan's Preservation of Personal Privacy Act*

16.     In 1988, members of the United States Senate warned that records of consumers' purchases and rentals of audiovisual and publication materials offer "a window into our loves, likes, and dislikes," and that "the trail of information

10

generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7–8 (1988) (statements of Sens. Simon and Leahy, respectively).

17.     Recognizing the need to further protect its citizens' privacy rights, Michigan's legislature enacted the PPPA "to preserve personal privacy with respect to the purchase, rental, or borrowing of certain materials," by prohibiting companies from disclosing certain types of sensitive consumer information.  H.B. No. 5331, 1988 Mich. Legis. Serv. 378 (West).

18.     Subsection 2 of the PPPA states:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials . . . *shall not disclose* to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

PPPA § 2 (emphasis added).

19.     Michigan's protection of reading information reflects the "gut feeling that people ought to be able to read books and watch films without the whole world knowing," and recognizes that "[b]ooks and films are the intellectual vitamins that fuel the growth of individual thought.  The whole process of intellectual growth is one of privacy—of quiet, and reflection.  This intimate

11

process should be protected from the disruptive intrusion of a roving eye." S. Rep.

No. 100–599, at 6 (Statement of Rep. McCandless).

20.     As Senator Patrick Leahy recognized in proposing the Video and

Library Privacy Protection Act (later codified as the Video Privacy Protection Act,

18 U.S.C. § 2710), "[i]n practical terms our right to privacy protects the choice of

movies that we watch with our family in our own homes. And it protects the

selection of books that we choose to read." 134 Cong. Rec. S5399 (May 10, 1988).

21.     Senator Leahy also explained why choices in movies and reading

materials are so private: "These activities are at the core of any definition of

personhood. They reveal our likes and dislikes, our interests and our whims. They

say a great deal about our dreams and ambitions, our fears and our hopes. They

reflect our individuality, and they describe us as people." *Id.*

22.     Michigan's passage of the PPPA also established as a matter of law

"that a person's choice in reading, music, and video entertainment is a private

matter, and not a fit subject for consideration by gossipy publications, employers,

clubs, or anyone else for that matter." *Privacy: Sales, Rentals of Videos, etc.*,

House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989 (attached hereto

as **Exhibit A**).

23.     Despite the fact that thousands of Michigan residents subscribe to

Defendant's publications, Defendant disregarded its legal responsibility by

12

systematically violating the PPPA.

### The Personal Information Market: Consumers' Personal Information Has Real Value

24.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[2]

25.     More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[3]

26.     The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types
> and amount of information collected by businesses, or
> why their information may be commercially valuable.
> Data is currency. The larger the data set, the greater

---

[2] The Information Marketplace: Merging and Exchanging Consumer Data (Mar. 13, 2001), at 8:15-11:16, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf (last visited Jan. 29, 2019).

[3] *See* Web's Hot New Commodity: Privacy, WSJ.com (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html (last visited Jan. 29, 2019).

potential for analysis—and profit.[4]

27.     In fact, an entire industry exists while companies known as data aggregators purchase, trade, and collect massive databases of information about consumers.  Data aggregators then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[5]

28.     The scope of data aggregators' knowledge about consumers is immense:  "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[6]

29.     Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of

---

[4] Statement of FTC Commissioner Pamela Jones Harbour (Dec. 7, 2009), at 2,  *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/remark s-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf  (last visited Jan. 29, 2019) (emphasis added).

[5] *See* Martha C. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited Jan. 29, 2019).

[6] Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* http://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-consumer-database-marketing.html (last visited Jan. 29, 2019).

information about consumers that are now available."[7]

30.      Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data.[8]

31.      In their letter, the co-Chairmen recognized that:

> By combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer.  This large[-]scale aggregation of the personal information of hundreds of millions of American citizens raises a number of serious privacy concerns.[9]

32.      Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers.  In addition to causing waste and

---

[7] Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c (last visited Jan. 29, 2019).

[8] *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Senator Ed Markey (July 24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information (last visited Jan. 29, 2019).

[9] *Id.*

inconvenience, direct-mail advertisers often use consumer information to lure

unsuspecting consumers into various scams,[10] including fraudulent sweepstakes,

charities, and buying clubs.  Thus, when companies like Defendant share

information with data aggregators, data cooperatives, and direct-mail advertisers,

they contribute to the "[v]ast databases of names and personal information" that

are often "sold to thieves by large publicly traded companies," which "put[s]

almost anyone within the reach of fraudulent telemarketers" and other criminals.[11]

33.     Information disclosures like Defendant's are particularly dangerous

to the elderly.  "Older Americans are perfect telemarketing customers, analysts

say, because they are often at home, rely on delivery services, and are lonely for

the companionship that telephone callers provide."[12]  The FTC notes that "[t]he

elderly often are the deliberate targets of fraudulent telemarketers who take

advantage of the fact that many older people have cash reserves or other assets to

---

[10] *See Prize Scams*, Federal Trade Commission,
http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited Jan. 29, 2019).

[11] Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times,  May
20, 2007, *available at*
http://www.nytimes.com/2007/05/20/business/20tele.html?pagewanted=all&_r=0
(last visited Jan. 29, 2019).

[12] *Id.*

spend on seemingly attractive offers."[13]

34.     Indeed, an entire black market exists while the personal information of vulnerable elderly Americans is exchanged.  Thus, information disclosures like Defendant's are particularly troublesome because of their cascading nature:  "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[14]

35.     Defendant is not alone in jeopardizing its subscribers' privacy and well-being in exchange for increased revenue:  disclosing subscriber information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties is a widespread practice in the publishing industry.

36.     Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth. Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

---

[13] *Fraud Against Seniors:  Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf (last visited Jan. 29, 2019).

[14] *See id.*

***Consumers Place Monetary Value on their Privacy and Consider Privacy Practices When Making Purchases***

37.     As the data aggregation and cooperative industry has grown, so too have consumer concerns regarding the privacy of their personal information.

38.     A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.[15]  As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[16]

39.     Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy- protective competitors.

40.     In fact, consumers' personal information has become such a valuable

---

[15] *See 2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, http://www.theagitator.net/wp-content/uploads/012714_ConsumerConfidenceReport_US1.pdf (last visited Jan. 29, 2019).

[16] *Id.*

commodity that companies are beginning to offer individuals the opportunity to sell their personal information themselves.[17]

41.     These companies' business models capitalize on a fundamental tenet underlying the personal information marketplace:  consumers recognize the economic value of their private data.  Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their personal data.[18]

42.     Thus, in today's economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[19]  As such, while a business offers customers a service that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer

---

[17] *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited Jan. 29, 2019).

[18] *See* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited Jan. 29, 2019).

[19] *See* Hann, *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at* http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&type=pdf (last visited Aug. 30, 2018) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.")

receives a service of less value than the service paid for.

### *Defendant Unlawfully Rents, Exchanges, And Discloses Its Customers' Personal Reading Information*

43.     Defendant maintains a vast digital database comprised of its customers' Personal Reading Information.  Defendant discloses its customers' Personal Reading Information to data aggregators and appenders who then supplement that information with additional sensitive personal information about each Defendant customer, including gender, purchasing habits and charitable. (*See, e.g.*, **Exhibits B-C**).

44.     Defendant then rents and/or exchanges its mailing lists—which include subscribers' Personal Reading Information identifying which individuals purchased which newspapers and magazines, and can include the sensitive information obtained from data aggregators and appenders—to other data aggregators and appenders, other consumer-facing businesses, non-profit organizations seeking to raise awareness and solicit donations, and to political organizations soliciting donations, votes, and volunteer efforts. (*See* **Exhibits B-C**).

45.     Defendant also discloses its customers' Personal Reading Information to data cooperatives, who in turn, give Defendant access to their own mailing list databases.

46.     As a result of Defendant's data compiling and sharing practices,

companies can purchase and/or obtain mailing lists from Defendant that identify Defendant customers by their most intimate details:  income, political affiliation, religious practice, and charitable donations.  Defendant's disclosure of such sensitive and personal information puts consumers, especially the more vulnerable members of society, at risk of serious harm from scammers.

47.    Defendant does not seek its customers' prior written consent to any of these disclosures and its customers remain unaware that their Personal Reading Information and other sensitive personal information is being rented and exchanged on the open market.

48.    Consumers can sign up for Defendant subscriptions through numerous media outlets, including the telephone or traditional mail.  When the consumer subscribes via means other than the Internet, Defendant never requires the individual to read or agree to any terms of service, privacy policy, or information-sharing policy.  Consequently, Defendant uniformly fails to obtain any form of consent from – or even provide effective notice to – its non-Internet customers before disclosing their Personal Reading Information.

49.    As a result, Defendant disclosed its customers' Personal Reading Information – including their reading habits and preferences that can "reveal intimate facts about our lives, from our political and religious beliefs to our health

concerns"[20] – to anybody willing to pay for it.

50.     By and through these actions, Defendant has intentionally disclosed to third parties its Michigan customers' Personal Reading Information without consent, in direct violation of the PPPA.

## CLASS ACTION ALLEGATIONS

51.     Plaintiffs seek to represent a class of all Michigan residents who, at any point in time between May 4, 2015 and July 30, 2016, had their Personal Reading Information pertaining to a print subscription to *The Wall Street Journal* disclosed to a third party by the Defendant without consent (the "Class").  Excluded from the Class is any person who has ever entered into a version of the *The Wall Street Journal* "Subscriber Agreement" that contained a section titled "Agreement to Arbitrate" with Defendant, as well as any entity in which Defendant has a controlling interest, and officers or directors of Defendant.

52.     Members of the Class are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class number in the tens of thousands.  The precise number of Class members and their identities are unknown to Plaintiffs at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or

---

[20] *California's Reader Privacy Act Signed into Law*, Electronic Frontier Foundation (Oct. 3, 2011), https://www.eff.org/press/archives/2011/10/03 (last visited Jan. 29, 2019).

publication through the distribution records of Defendant.

53.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:  (a) whether Defendant is a "retailer or distributor" of publications (*i.e.*, newspapers and magazines); (b) whether Defendant obtained consent before disclosing to third parties Plaintiffs' and the Class's Personal Reading Information; (c) whether Defendant's disclosure of Plaintiffs' and the Class's Personal Reading Information violated the PPPA; and (d) whether Defendant's rental, exchange, and/or disclosure of Plaintiffs' and the Class's Personal reading Information constitutes unjust enrichment.

54.     The claims of the named Plaintiffs are typical of the claims of the Class in that the named Plaintiffs and the Class sustained damages as a result of Defendant's uniform wrongful conduct, based upon Defendant's disclosure of Plaintiffs' and the Class's Personal Reading Information.

55.     Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class members they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiffs and their counsel.

56.     The class mechanism is superior to other available means for the fair

and efficient adjudication of the claims of Class members.  Each individual Class

member may lack the resources to undergo the burden and expense of individual

prosecution of the complex and extensive litigation necessary to establish

Defendant's liability.  Individualized litigation increases the delay and expense to

all parties and multiplies the burden on the judicial system presented by the

complex legal and factual issues of this case.  Individualized litigation also

presents a potential for inconsistent or contradictory judgments.  In contrast, the

class action device presents far fewer management difficulties and provides the

benefits of single adjudication, economy of scale, and comprehensive supervision

by a single court on the issue of Defendant's liability.  Class treatment of the

liability issues will ensure that all claims and claimants are before this Court for

consistent adjudication of the liability issues.

## <u>COUNT I</u>
**Violation of the Preservation of Personal Privacy Act**
**(PPPA § 2)**

57.    Plaintiffs repeat the allegations contained in the foregoing paragraphs

as if fully set forth herein.

58.    Plaintiffs bring this claim individually and on behalf of members of

the Class against Defendant.

59.    As a publisher that sells newspaper and magazine subscriptions to

consumers, Defendant is engaged in the business of selling written materials at

retail.  *See* PPPA § 2.

60.     By purchasing subscriptions to *The Wall Street Journal*, Plaintiffs purchased written materials directly from Defendant.  *See* PPPA § 2.

61.     Because Plaintiffs purchased written materials directly from Defendant, they are "customers" within the meaning of the PPPA.  *See* PPPA § 1.

62.     At various times between May 4, 2015 and July 30, 2016, Defendant disclosed Plaintiffs' Personal Reading Information, which identified them as *The Wall Street Journal* customers, in at least three ways.

63.     First, Defendant disclosed mailing lists containing Plaintiffs' Personal Reading Information to data aggregators and data appenders, who then supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to Defendant.

64.     Second, Defendant disclosed mailing lists containing Plaintiffs' Personal Reading Information to data cooperatives, who in turn gave Defendant access to their own mailing list databases.

65.     Third, Defendant rented and/or exchanged its mailing lists containing Plaintiffs' Personal Reading Information—enhanced with additional information from data aggregators and appenders—to third parties, including other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes.

66.     Because the mailing lists included the additional information from the data aggregators and appenders, the lists were more valuable, and Defendant was able to increase its profits gained from the mailing list rentals and/or exchanges.

67.     By renting, exchanging, or otherwise disclosing its customer lists, between May 4, 2015 and July 30, 2016, Defendant disclosed to persons other than Plaintiffs' records or information concerning their purchases of written materials from Defendant.  *See* PPPA § 2.

68.     The information Defendant disclosed indicates Plaintiffs' names and addresses, as well as the fact that they subscribed to *The Wall Street Journal*. Accordingly, the records or information disclosed by Defendant indicate Plaintiffs' identities.  *See* PPPA § 2.

69.     Plaintiffs and the members of the Class never consented to Defendant disclosing their Personal Reading Information to anyone.

70.     Worse yet, Plaintiffs and the members of the Class did not receive notice before Defendant disclosed their Personal Reading Information to third parties.

71.     On information and belief, Defendant's disclosures, between May 4, 2015 and July 30, 2016, of Plaintiffs' and the Class's Personal Reading Information were not made pursuant to a court order, search warrant, or grand jury subpoena.

26

72.     Defendant's disclosures, between May 4, 2015 and July 30, 2016, of Plaintiffs' and the Class's Personal Reading Information were not made to collect payment for their subscriptions.

73.     Defendant's disclosures, between May 4, 2015 and July 30, 2016, of Plaintiffs' Personal Reading Information were made to data aggregators, data appenders, data cooperatives, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes—all in order to increase Defendant's revenue.  Accordingly, Defendant's disclosures were not made for the exclusive purpose of marketing goods and services directly to Plaintiffs and the members of the Class.

74.     By disclosing Plaintiffs' Personal Reading Information, between May 4, 2015 and July 30, 2016, Defendant violated Plaintiffs' and the Class's statutorily-protected right to privacy in their reading habits.  *See* PPPA § 2.

75.     Additionally, because Plaintiffs and the members of the Class paid for their subscriptions to Defendant's publications, and Defendant was obligated to comply with the PPPA, Defendant's unlawful disclosure of Plaintiffs' and the other Class members' Personal Reading Information deprived Plaintiffs and the Class members of the full value of their paid-for subscriptions.  Because Plaintiffs and the other Class members ascribe monetary value to the privacy of their Personal Reading Information, Defendant's unlawful rental, exchange, and/or other

disclosure of their Personal Reading Information caused them to receive less value than they paid for, thereby causing them economic harm.

76.     Likewise, because Plaintiffs and the other Class members ascribe monetary value to the privacy of their Personal Reading Information, a newspaper or magazine publication subscription that keeps their Personal Reading Information private is more valuable than one that does not.

77.     Accordingly, had Plaintiffs been adequately informed of Defendant's disclosure practices, they would not have been willing to purchase their *The Wall Street Journal* subscription at the price charged, if at all.  Thus, Defendant's unlawful disclosures caused Plaintiffs economic harm.

78.     Defendant's disclosure of Plaintiffs' Personal Reading Information to third parties has also caused an influx of third party print advertisements.

79.     As a result of Defendant's unlawful disclosure of their Personal Reading Information, Plaintiffs and the members of the Class have suffered privacy and economic injuries.  On behalf of themselves and the Class, Plaintiffs seek:  (1) an injunction requiring Defendant to obtain consent from Michigan customers prior to the disclosure of their Personal Reading Information as required by the PPPA; (2) actual damages, including disgorgement, or $5,000.00, whichever is greater, per Class member pursuant to PPPA § 5(a); and (3) costs and reasonable attorneys' fees pursuant to PPPA § 5(b).

## COUNT II
**Unjust Enrichment**

80.     Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein.

81.     Plaintiffs bring this claim individually and on behalf of the members of the Class against Defendant.

82.     Plaintiffs and the Class members conferred benefits on Defendant by providing Defendant with their Personal Reading Information and paying Defendant for their newspaper and magazine publication subscriptions.

83.     Defendant received and retained the information and money belonging to Plaintiffs and the Class when Plaintiffs and the Class subscribed to Defendant's publications.

84.     Because Defendant received and processed Plaintiffs' and the Class's subscription payments and Personal Reading Information, and because Defendant has employees and/or agents handling customer accounts and billing as well as customer data, Defendant appreciates or has knowledge of such benefits.

85.     Under the PPPA, Plaintiffs and the Class members were entitled to confidentiality in their Personal Reading Information as part of their subscriptions.

86.     Under principles of equity and good conscience, because Defendant failed to comply with the PPPA, Defendant should not be allowed to retain the full

amount of money Plaintiffs and the Class paid for their subscriptions or the money it received by renting, exchanging, and/or otherwise disclosing Plaintiffs' and the Class's Personal Reading Information.

87.     Moreover, Defendant should not be allowed to retain the monies it received as a result of renting, exchanging, and/or otherwise disclosing Plaintiffs' and the Class's Personal Reading Information.

88.     Plaintiffs and the other Class members have suffered actual damages as a result of Defendant's unlawful conduct in the form of the value Plaintiffs and the other Class members paid for and ascribed to the confidentiality of their Personal Reading Information.  This amount is tangible and will be calculated at trial.

89.     Additionally, Plaintiffs and the Class members have suffered actual damages inasmuch as Defendant's failure to inform them that it would disclose their Personal Reading Information caused them to purchase newspaper or magazine publication subscriptions when they otherwise would not have.

90.     Further, a portion of the purchase price of each *The Wall Street Journal* subscription sold to Plaintiffs and the other Class members was intended to ensure the confidentiality of Plaintiffs' and the other Class members' Personal Reading Information, as required by the PPPA.  Because Plaintiffs and the other Class members were denied services that they paid for and were entitled to

receive—i.e., confidentiality of their Personal Reading Information—and because Plaintiffs and the Class would have commanded a discount to voluntarily forego those benefits, they incurred actual monetary damages.

91.     To prevent inequity, Defendant should return to Plaintiffs and the Class the value they ascribe to confidentiality of their Personal Reading Information and all money derived from Defendant's rental, exchange, and/or other disclosure of Plaintiffs' and the Class's Personal Reading Information.

92.     Accordingly, Plaintiffs and the Class members seek an order declaring that Defendant's conduct constitutes unjust enrichment, and awarding Plaintiffs and the Class restitution in an amount to be calculated at trial equal to the amount of money obtained by Defendant through its rental, exchange, and/or other disclosure of Plaintiffs' and the Class's Personal Reading Information.

## PRAYER FOR RELIEF

93.     WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek a judgment against Defendant as follows:

A.     For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Class and Plaintiffs' attorneys as Class Counsel to represent the Class;

B.     For an order declaring that Defendant's conduct as described herein violates the Preservation of Personal Privacy Act, PPPA;

C.     For an order finding in favor of Plaintiffs and the Class on

all counts asserted herein;

D.　　For an award of actual damages or $5,000, whichever is greater, to each Plaintiff and each Class member, as provided by the Preservation of Personal Privacy Act, PPPA § 5(a);

E.　　For prejudgment interest on all amounts awarded;

F.　　For an order of restitution and all other forms of equitable monetary relief;

G.　　For injunctive relief as pleaded or as the Court may deem proper; and

H.　　For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all causes of action and issues so triable.

Dated:　June 16, 2020　　　　　Respectfully submitted,

**CHRISTOPHER RENTOLA and SHERREE RENTOLA**

By:_____/s Philip L. Fraietta_____
One of Plaintiffs' Attorneys

Joseph I. Marchese
jmarchese@bursor.com
Philip L. Fraietta
pfraietta@bursor.com
BURSOR & FISHER, P.A.
888 Seventh Avenue
New York, New York 10019
Tel: 646.837.7150
Fax: 212.989.9163

Frank S. Hedin
fhedin@hedinhall.com
David W. Hall (*Admission Forthcoming*)
dhall@hedinhall.com
HEDIN HALL LLP
1395 Brickell Avenue, Suite 1140
Miami, Florida 33131
Tel: 305.357.2107
Fax: 305.200.8801

Nick Suciu III
nicksuciu@bmslawyers.com
BARBAT, MANSOUR & SUCIU PLLC
6905 Telegraph Road, Suite 115
Bloomfield Hills, Michigan 48301
Tel: 313.303.3472

*Counsel for Plaintiffs*